# UNITED STATES DISTRICT COURT
### for the
### EASTERN DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2009 MAY -4  P 2: 12

DEBRA FELDMAN
13 Aurora Lane
Salem, MA  01970
(617) 957-5367
*Pro Se Counsel*

Civil Action No.

Debra Feldman

Plaintiff

v.

TWENTIEH CENTURY FOX,
TWENTIEH CENTURY FOX
TELEVISION, TWENTIEH
CENTURY FOX GROUP, NEWS
CORPORATION,NBC UNIVERSAL,
INC., KEVIN FALLS, MARC
KORMAN, UNITED TALENT
AGENCY, ENDEAVOR (talent
management) SHONDA RHIMES,
ABC TELEVISION STUDIOS (aka
ABC Studios, Touchstone Television),
ABC ENTERTAINMENT, MARK
GORDON PRODUCTION
COMPANY, GREG BERLANTI,
MARC GUGGENHEIM, AND DOES
1-75.

Defendant(s)

## COMPLAINT FOR COPYRIGHT INFRINGEMENT
## MISAPPROPRIATION OF INTELLECTUAL PROPERTY
## WILLFUL BLINDNESS
## ALLOWING MISAPPROPRIATION OF IP
## AND UNFAIR COMPETITION

Plaintiff, complaining of Defendants, through *pro se* council, hereby allege upon

information and belief as follows:

## THE PARTIES

1. Plaintiff DEBRA FELDMAN ("FELDMAN") is an individual residing in Salem, Massachusetts. FELDMAN has over 35 years experience in a wide range of the fine and applied arts including design, creation, and writing. Plaintiff received her undergraduate degree in the fine and applied arts at the prestigious Rhode Island School of Design (RISD), as well as a Masters in research and development writing from Simmons College (Simmons). FELDMAN also teaches creative writing at a Massachusetts college.

2. Defendant 20th CENTURY FOX (hereafter known as FOX, et.al.) is a corporation with several possible addresses including, but not limited to, P.O. Box 900 Beverly Hills, CA   90213-9000 and/or 10201 W. Pico Boulevard, Los Angeles, CA 90064. Defendant 20th CENTURY FOX is a corporation transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

3. Defendant 20th CENTURY FOX TELEVISION (hereafter known as FOX, et.al.) is a corporation with several possible addresses including, but not limited to, P.O. Box 900 Beverly Hills, CA   90213-9000 and/or 10201 W. Pico Boulevard, Los Angeles, CA 90064. Defendant 20th CENTURY FOX TELEVISION is a corporation transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

4. Defendant 20th CENTURY FOX GROUP (hereafter known as FOX, et.al.) is a corporation with one or more possible addresses including, but not limited to P.O. Box 900 Beverly Hills, CA   90213-9000.   Defendant 20th

CENTURY FOX GROUP is a corporation transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

5.   Defendant NEWS CORPORATION (hereafter known as FOX, et.al.) is a corporation with several possible addresses including, but not limited to, P.O. Box 900 Beverly Hills, CA   90213-9000 and/or 10201 W. Pico Boulevard, Los Angeles, CA 90064. Defendant NEWS CORPORATION is a corporation transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

6.   Defendant NBC UNIVERSAL, INC. (hereafter known as "NBC") is a corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business at 30 Rockerfeller Plaza, New York, New York 10112. Defendant NBC UNIVERSAL, INC. is transacting and doing business in this judicial district and is subject to the personal jurisdiction of this court.

7.   Defendant KEVIN FALLS ("FALLS") is an individual who, during December of 2007, resided at 4114 Fulton Avenue, Sherman Oaks, California, and may still reside there.  Defendant KEVIN FALLS is a co-executive producer who is transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

8.   Defendant MARC KORMAN (hereafter known as "KORMAN") is an individual whose residence address is 1660 Queens Rd, Los Angeles, CA 90069. Defendant MARC KORMAN is an individual who was a partner, officer, manager member, or other managing agent of Defendant UNITED

TALENT AGENCY whose principal place of business during June of 2007 was UNITED TALENT AGENCEY.  Defendant KORMAN changed work places in 2008 to become a partner, officer, manager member, or other managing agent at Defendant ENDEAVOR (a talent agency).  Defendant KORMAN is a talent representative transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

9.  Defendant UNITED TALENT AGENCY (hereafter known as "UTA"). is a company having its principal office and place of business at 44 Montgomery Street San Francisco, CA 94104-4602 and/or 9560 Wilshire Blvd., Beverly Hills, CA 90212.  Defendant UTA is a talent management company transacting and doing business in this judicial district and is subject to the personal jurisdiction of this court.

10.  Defendant ENDEAVOR. is a company having its principal office and place of business at 9601 Wilshire Boulevard, 3rd Floor, Beverly Hills, CA 90210, with main phone number 310-248-2000 and/or 152 West 57th Street, 25th Floor, New York, NY 10019, with main phone number 212-625-2500. Defendant ENDEAVOR is a talent management company transacting and doing business in this judicial district and is subject to the personal jurisdiction of this court.

11.  Defendant SHONDA RHIMES, (hereafter known as RHIMES) is an individual whose address of contact is 8383 Wilshire Blvd.; Suite 500, Beverly Hills, CA  90211. Defendant RHIMES is a producer transacting and doing business in this judicial district and is subject to the personal

jurisdiction of this court.

12. ABC TELEVISION STUDIOS / ABC ENTERTAINMENT (aka ABC Studios, Touchstone Television, hereafter known as "ABC, et.al."), is a company having its principal office and place of business at 400 Broadway, Sacramento, CA 91858 and/or 500 S. Buena Vista Street. City, Burbank, CA 91521. Defendant ABC TELEVISION STUDIOS is transacting and doing business in this judicial district and is subject to the personal jurisdiction of this court.

13. MARK GORDON COMPANY is a production company having its principal office and place of business at an unknown address in Los Angeles, CA . Defendant MARK GORDON COMPANY (hereafter known as "GORDON, et.al") is transacting and doing business in this judicial district and is subject to the personal jurisdiction of this court.

14. Defendant MARK GORDON (hereafter known as "GORDON, et.al.") is an individual whose address is 1990 S. Bundy Drive, Los Angeles, California 90025. Defendant MARK GORDON is a producer transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

15. Defendant GREG BERLANTI (hereafter known as "BERLANTI") is an individual whose address is 8033 W. Sunset Blvd #9750, West Hollywood, California 90046. Defendant GREG BERLANTI is a producer transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

- 5 -

16.     Defendant MARC GUGGENHEIM (hereafter known as "GUGGENHEIM") is an individual whose address is 6345 Balboa Blvd, Encino, California 91316. Defendant MARC GUGGENHEIM is a producer transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

17. Upon information and belief, Defendants Does 1 through 20 are individuals who are officers, managing members, or other managing agents of one or more of the defendant organizations and are conscious dominant and active forces behind the wrongful acts of the defendant organizations complained of herein, which wrongful acts they have engaged in for the benefit of the defendant organizations and for their own individual gain and benefit. Defendant Does 1-20 are transacting and doing business in the judicial district subject to the personal jurisdiction of this Court.

18.   Upon information and belief, Defendants Does 21-75 are other movie companies, television companies, talent agencies, production companies, distribution companies, advertising companies, and related entities that provided services to the named defendants and, accordingly, are liable directly or indirectly for the harms alleged herein.

19. For purposes of this Verified Complaint, the above-described defendants may be referenced collectively as the "Defendants".

## JURISDICTION AND VENUE

20. Subject matter Jurisdiction of this Court is based on the laws of the United States concerning actions relating to copyrights (28 U.S.C. § 1331 and §

1338. This action arises under the Federal Copyright Laws of the United States, including 28 U.S.C. §§ 2201 and 2202, and 17 U.S.C. § 101 et seq., as set forth below.

21. Supplemental jurisdiction of any additional claims is based on 28 U.S.C. § 1367, because such claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts, The Court also has jurisdiction over all claims herein of unfair competition pursuant to U.S.C. § 1338(b).

22. Venue for this action is proper in this district, pursuant to the Judiciary and Judicial Procedure Laws of the United States, 28 U.S.C. §§ 1391 and 1400 in that the Defendants are doing business in this District.

## **FACTS COMMON TO ALL CLAIMS**

23. Plaintiff FELDMAN has been writing since 1968, the base origins of which date to June 6, 1968 and the assassination of Robert F. Kennedy. Her piece written in memoriam for Senator Kennedy was of a standard that school officials commanded its broadcast over the P.A. system of Plaintiff's school and printed same in the school's newspaper.    Additionally, Plaintiff FELDMAN began writing "in earnest" in June of 1990, continues to write and has been teaching creative writing since 2007.

24. Plaintiff's 1990 effort culminated in the first of a collective work of fiction -- a series of novels about multiple involuntary time-travelers containing who travel in serial fashion. The group of novels came to be called *The Overlap Series*.

25.   The first installment in Plaintiff FELDMAN's series, *The Passion of Strangers,* was completed in 1994 and set aside after completing the "poor man's copyright" process.

26.  Plaintiff FELDMAN began the second installment of *The Overlap Series, An Ordinary Hero*, in November of 2000.  *An Ordinary Hero* was copyrighted and published in 2003 while Plaintiff continued the on-going editing of *The Passion of Strangers* which included its literary link to *An Ordinary Hero*. *The Passion of Strangers* acquired a name change and is copyright applied as *The Comfort of Strangers*.  On April 12, 2005, Plaintiff began work on the third novel in *The Overlap Series*, currently titled *The Red Tattoo*.

27.  In a concerted effort NOT to emulate any pre-existing time-travel work (serial or otherwise), Plaintiff FELDMAN's specific collection of time-travel elements cannot be found as a united group in any work preceding or following the writing of *The Passion of Strangers* or *An Ordinary Hero*. Each of these works is wholly original in their end product from other time-travel stories/series of the same genre -- serial time-travel.  Likewise, the stories therein are wholly original in their end product from other fiction on the market.

28.  Plaintiff FELDMAN's unfinished works in *The Overlap Series* are *The Red Tattoo* (copyright applied) and *Days of Grace*.  As their predecessors, each of these stories are comprised of a full cast of named characters having specific experiences and specific lives.  As an aid in keeping *The Overlap Series* on track and correct in medical details, Plaintiff compiled a "names

list" as well as the highly technical and gory details of bone marrow transplantation and adjacented them to the end of *The Red Tattoo*.

29. Commencing 1993, Plaintiff FELDMAN's creative work on behalf other companies has graced literally hundreds of thousands of product boxes, for products successfully distributed nationwide. All told, Plaintiff FELDMAN has over 35 years professional experience as CREATOR of assorted artistic "works" whose substance lies in nothing other than Plaintiff's original ideas. Plaintiff's writing, by extension of her other creative endeavors, likewise designates her as "CREATOR of something from nothing but her own original ideas".

30. Plaintiff's *Overlap Series* includes, but is not limited to, *An Ordinary Hero* (2003); *The Passion of Strangers/The Comfort of Strangers* (1994); *The Red Tattoo* (2005) and *Days of Grace*. Each literary work which is the product of months of research and development work by FELDMAN for a creative work of fiction which [1] centers on the lives of multiple individuals; [2] involuntarily conscripted into serial time-travel; [3] whose time-travel purpose is toward a beneficial and altruistic end; [4] with no "intended" benefit for the time-travelers except as a side benefit; [5] whose altruism often as not acts to their detriment; [6] whose travel is controlled by an entity other than the time-travelers, [7] at whose beck-and-call the time-travelers are at all times, [8] able neither to choose nor refuse (neither volunteer, nor decline to be in and of service to the entity); [9] who experience significant and specific "WARNING SIGNS" of imminent time-

travel.

31. Plaintiff FELDMAN does not claim "original creation" of serial time-travel.

32. Plaintiff FELDMAN's claim of "original creation" with regard to serial time-travel goes to the theme of it being [1] **INVOLUNTARY**, [2] at the behest of a powerful unseen entity, [3] without aid/benefit of machine, [4] without high or low technology (including but not limited to machines; mechanical teleportation by beam or other; text, mental concentration or other), [5] absent quantum physics or mechanics, [6] absent any helper/assistant from the traveler's own or any other time, [7] absent any form of physical defect, [8] absent naturally occurring phenomenon (such as in *Frequency*), [9] absent intent, motive, premeditation, or volunteerism, [10] absent selection (the ability to choose when and to where the travelers will travel), [11] with symptoms which act as a **"WARNING DEVICE"** of imminent time-travel. This specific collection of elements is consistently the basis for all works in Plaintiff FELDMAN'S *Overlap Series*, is singularly exclusive to Plaintiff's work and is exclusively her creative INTELLECTUAL PROPERTY. There are no other serial time-travel works which consistently embody all of the above elements.

33. Consistent in *The Overlap Series*, is that while the serial time-travelers are unaware of their exact travel purpose at the time of travel they are, nonetheless, aware they will travel multiple times. Each story in *The Overlap Series* eludes to the time-travelers' being selected as travelers based on to their ability to accidentally do or say the exact thing, or be in the exact

necessary place to correct the unsatisfactory outcome of an event, before the event actually happens, for people who otherwise would be or already are in trouble.   This awareness of "command performance" serial time-travel, against the traveler's own selection, will or convenience; and "seat-of-the-pants" reactions in the time-travel moment to complete a mission/assignment is fully emulated by Defendant FALLS in the serial time-travel series *Journeyman*.

34. Consistent in Plaintiff FELDMAN's *The Comfort of Strangers* is a singular and specific "travel after-effect" (post-travel), indicating that, for the time being, travel is complete.   This singular and specific after-effect is fully emulated by Defendant FALLS in the involuntary serial time-travel series *Journeyman*.

35. Plaintiff FELDMAN's *An Ordinary Hero* contains a singular and specific "WARNING DEVICE" (pre-travel) belonging, solely to the main character, notating that his time-travel is eminent.   This singular and specific WARNING DEVICE is fully emulated by Defendant FALLS, having also attributed the trait only to the same-lived main character in the involuntary serial time-travel series *Journeyman* -- the tall, blue-eyed, blond serial time-traveler.

36. Plaintiff FELDMAN's *An Ordinary Hero*'s main character is a tall, blue-eyed, blond serial time-traveler, traveling through time during the period in his own life when he has a wife and young son who, while alone, witnesses his father travel to an alternate time.   This specific "life set-up" of wife and

young son who witnesses his father travel is fully emulated by Defendant FALLS in the involuntary serial time-travel series *Journeyman*.

37. Plaintiff FELDMAN' main character in *An Ordinary Hero*'s possesses a specific behavioral characteristic and the specific genetic trait of hair color that is LIGHTER than that of his son and nearly the same color as that of his mother. Defendant FALLS' fully emulates this specific behavioral characteristic and singularly specific genetic trait in the involuntary serial time-travel series *Journeyman*.

38. Plaintiff FELDMAN's novel cover art for *An Ordinary Hero* carries a Police composite of the tall blue-eyed, blond serial time-traveler. Defendant FALLS selected an actor whose facial characteristics fully emulate those found in the Police composite in the cover art for *An Ordinary Hero*.

39. Consistent throughout Plaintiff FELDMAN's *The Comfort of Strangers* is noted the singular and specific "destination location" to which each of the time-travelers must travel. This singular "destination location" is fully emulated by Defendant FALLS in the serial time-travel series *Journeyman*.

40. Consistent throughout *The Overlap Series* is a "limited visual tag" indicating a particular time-travel mission is complete (which is to say a life was changed by the presence of the time traveler). This singular "limited visual tag" is fully emulated by Defendant FALLS in the involuntary serial time-travel series *Journeyman*.

41. Consistent in Plaintiff FELDMAN's *Overlap Series* are the far reaching consequences to the traveler for having traveled in the first place – all of

them significant; not all of them positive. The identical consequences are fully emulated by Defendant FALLS in the serial time-travel series *Journeyman*.

42. The thrust of Plaintiff FELDMAN's *Overlap Series* is not the story of serial time-travel, but the stories of people subjected to involuntary serial time-travel. The travelers possess no means to transport themselves by their own will/intent, but are juggled about by a powerful entity. The detailed work therein embodies plot, characters, setting, and numerous other details comprising the entire *Overlap Series* creative work, and is fully emulated in minute detail by Defendant FALLS in the involuntary serial time-travel series *Journeyman*.

43. Consistent in Plaintiff FELDMAN's work are a collection of family, friends, and strangers in the travelers' lives who experience specific love, specific trouble, specific need, specific pain, suffer specific great romance, specific tragic love and specific tragic loss. The detailed work therein comprises the entire *Overlap Series* as a singularly creative work and is fully emulated in minute detail by Defendant FALLS in the involuntary serial time-travel series *Journeyman*.

44. Consistent with *The Overlap Series* storylines (not withstanding the Science Fiction element of time-travel), on or about June 28, 2003 *An Ordinary Hero* was printed within the Crime/Mystery theme (Drama variety) through Mystery and Suspense Press and Plaintiff's membership in Mystery Writers of America. This particular theme (drama vs. comedy/other) within the

serial time-travel genre is fully emulated by Defendant FALLS in the serial
time-travel series *Journeyman.*

45. The style, pace, and characters within *The Overlap Series* (ie: names, lives,
and smart-Alec banter) are, likewise, fully emulated by Defendant FALLS in
the involuntary serial time-travel series *Journeyman.*

46. Plaintiff, FELDMAN, is the owner of United States Copyright Registration
Number TXu1-113-763 (the "Copyright") for *An Ordinary Hero.* Plaintiff is
the holder of Copyright Office service request for copyright 1-149428301 for
*The Comfort of Strangers* (formerly titled *Overlap - The Passion of
Strangers/The Passion of Strangers).* Plaintiff is the holder of Copyright
Office service request for copyright 1-149430471 for *The Red Tattoo.*

47.   Additionally, Plaintiff, FELDLMAN, utilized the United States Postal
Service, an agent of the Federal Government, to postage-date her original
finished manuscript for *The Comfort of Strangers* postmark Jan 3, 1995
(under its original title *Overlap - The Passion of Strangers*) and her original
manuscript for *An Ordinary Hero* postmark September 21, 2001. Both
manuscripts remain in their sealed condition with United States Postal
Service postage affixed, affording them what is referenced as "poor man's
copyright".

48. Plaintiff made extensive effort to protect and document her creative endeavors
in every manner known at the time in question.

49. Plaintiff FELDMAN wrote a treatment and screenplay for *An Ordinary Hero*
(Sept. 21, 2002 and Sept. 30, 2002; respectively); never submitted to anyone;

each of which resides solely in Plaintiff's computer.

50.  Plaintiff FELDMAN made no attempt to contact Defendants prior to the airing of Journeyman.

51.  In 2005, Plaintiff was interviewed on a local radio station ("WBZ"), but with broadcast capabilities extending world wide.  Plaintiff was an advertised guest on a show whose host (JORDAN RICH) is a widely known proponent of the written word.  A significant number of guests on the Jordan Rich Show are authors (well known and unknown).  Those looking for the latest "great read" regularly tune-in to THE JORDAN RICH SHOW to learn about an author and their work.  Plaintiff FELDMAN's author website was announced numerous times during the interview.

52.  Worldwide and with as little technology as a computer and an internet connection any person/s may have tuned-in to hear that radio broadcast in real time via WBZ website feature called "Listen-Live".  With as little as Plaintiff FELDMAN's website address any person/s can garner the location of her physical home address and that home's listed land-line phone number. With as little effort as a call to 4-1-1, any person/s could learn that Plaintiff's home also possessed a second listed landline.  Between the years 2005 and current day, the three (3) main reasons for any home to possess a second land-line are/were [1] business in the home; [2] children's line, [3] dedicated computer dial-up connection for "technological dinosaurs" such as Plaintiff FELDMAN.  A few short phone calls to a number which is never answered and has no message machine quickly causes one to draw the conclusion of

dedicated computer dial-up connection.

53. Any person/s with a modicum of knowledge of "computer hacking" could easily "sit" on Plaintiff FELDMAN's dedicated COMPUTER phone line, wait for Plaintiff to dial-up onto the internet, and enter her computer undetected to help themselves to whatever was on her hard-drive at the time; including but not limited to the entire *Overlap Series*.

54. Any person/s possessing a modicum of knowledge of wire or phone tap could easily "sit" on Plaintiff's dedicated home land-line, wait for Plaintiff to place or receive a call and been privy to any/all intimate conversations and the details therein between Plaintiff and other parties. The singular and intimate details of Plaintiff's life are discussed regularly by phone and at length. These details of Plaintiff's life lie far enough beyond the main stream to be considered singular in nature and known to the limited number of parties within Plaintiff's personally involved in the events. Such intimate details of Plaintiff's life appeared in excruciating and explicit detail in Defendants' televised product *Journeyman*. There is virtually no way such "off-the-beaten-path" events could occur both to Plaintiff FELDMAN in a virtual vacuum in real live and simultaneously occur to Defendant FALLS via "original creation". It is believed that some form of eavesdropping on Plaintiff's personal computer and telephone took place when Plaintiff had the expectation of privacy.

55. Likewise, full "genesis" credits for *Journeyman* are well noted as belonging to Defendant KORMAN while a partner at Defendant UTA. Defendant

FALLS so noted this "genesis" credit during various interviews. As an attorney, it is conceivable that Defendant KORMAN may have access to person/s possessing listening or hacking capabilities.

56.   Defendant UTA profited from the success of *Journeyman* via direct representation of Defendant FALLS through Defendant KORMAN. As partner at Defendant UTA and agent for Defendant FALLS, Defendant KORMAN possibly profited several times over - drawing an agent commission by placing Defendant FALLS in a specific position of gainful employment he has stated he otherwise would not have had. Defendant FALLS went on record as saying that without Journeyman, his only employment would have been as a "one of" co-executive producer on the TV show *Shark* which came to him only though his friendship with actor James Woods of the same show.

57.   Without access to personal and business financial records for Defendants UTA and KORMAN there is no way to confirm whether Defendant KORMAN profited from the airing of Journeyman in any ancillary way as partner at Defendant UTA. As a partner at Defendant UTA and oft noted "genesis" of *Journeyman*, Defendant KORMAN, may place Defendant UTA in a position of culpability for the actions by one of its partners, on its behalf, by acquiring or being in receipt of misappropriated Intellectual Property and the beneficiary of proceeds from a corrupt enterprise.

58.   Shortly after Journeyman aired and was subsequently cancelled, Defendant KORMAN left/gave up/sold his partnership at UTA and became a partner at

Defendant ENDEAVOR where he continues to collect a percentage of Defendant FALLS earnings.

59. Defendant FALLS continues to be employed based on the quality of work outside his poorly reviewed efforts and the "success" of *Journeyman* which was not his work. (It is not known at this time if any monies garnered by Defendant KORMAN and Defendant ENDEAVOR lie in any residual/royalty agreement between Defendant KORMAN, Defendant FALLS, Defendants FOX, et.al. and NBC with regard to *Journeyman*.)

60. There are additional shows to *Journeyman,* whose writers are also represented by agents at Defendant ENDEAVOR, which portray whole scenes, characters, motives and acts/actions noted in Plaintiff FELDMAN's work. Writers for these aforementioned shows (also listed in this brief) derive the "genesis" for their work from somewhere. It would appear that Defendant KORMAN is affiliated with a host of agents representing a host of writers who not only derive the "genesis" of their work from the same place as Plaintiff FELDMAN but utilize the same expression of ideas and syntax and hold fast to identical life philosophies.

61. Alternate means of access to Plaintiff FELDMAN's work (other than hacking/wire tap) are also a possibility.

62. As of early June, 2006, a man named Richard Renshaw began living in Plaintiff's home. Mr. Renshaw moved to Salem, Massachusetts from Punta Gorda, Florida expressly to reinstate a committed relationship with Plaintiff FELDMAN. Within the month of Mr. Renshaw's arrival and residence in

Plaintiff's home, Mr. Renshaw made himself unpleasant to the point Plaintiff demanded he leave her premises immediately. Mr. Renshaw reloaded his vehicle in less time than required to unload it in the first place plus returned the room he occupied in Plaintiff's home to a condition which did not belie the fact that someone had been living in it, suggesting that Mr. Renshaw was pre-prepared to depart at a moment's notice.

63. During Mr. Renshaw's residency in Plaintiff's home, he enjoyed full and sequestered access to the computer on which Plaintiff writes her books.

64. Mr. Renshaw is well acquainted with Martin Henshaw of Punta Gorda, Florida, with numerous/various contacts in Hollywood circles accepting treatments/submissions for television shows, movies, and other broadcasts. It is not beyond the scope of reality or reason that Mr. Renshaw, while living in Plaintiff's home and with some variety of long distance assistance from Mr. Henshaw, acquired Plaintiff FELDMAN's written work for Defendants FALLS and KORMAN through accessing and/or allowing access to Plaintiff FELDMAN'S computer contents.

65. Defendant FALLS is a noted *co-executive producer* with numerous co-executive producer television credits and awards to his name. As "one of" a group of not fewer than ten (10) other co-executive producers for the *West Wing*, Defendant FALLS secured four (4) Emmy awards as "one of" the co-executive producers. Based on his accomplishments as a "one of" for the *West Wing* and other lesser (non-award winning, short run, never run or cancelled shows), Defendant FALLS has the ability to draw attention to

himself via his connection to personal contacts in Hollywood's entertainment community as well as through his agent Defendant KORMAN (late of Defendant UTA, currently of Defendant ENDEAVOR) also eminently visible in the entertainment community and able to draw attention to himself, as an agent and an attorney.

66. Defendant FALL has minimal co-writing movie and/or television credits to his name. He has no "solo" television writing credits of any import or success. Prior to *Journeyman*, Defendant FALLS had no *successful* (positive reviewed) television or other "CREATOR" credits to his name.

67. Defendant FALLS has two (2) movie credits as CREATOR (1993 - The Temp and 2001 -Summer Catch). Each work was professionally reviewed (Ew.com and/or Rolling Stone Magazine and/or FilmFodder.com) for writing, content and storyline. A paraphrased evaluation of each work: a predictable mess which is neither clever nor witty. (Actual word used by FilmFodder re: Defendant FALLS' writing ability was "disaster"). Professional evaluations of Defendant Falls "solo" writing credentials were letter grades of "D" and "F" (Ew.com - The Temp and FilmFodder.com - Summer Catch, respectively).

68. Early in the process, Defendants FOX, et.al. and/or NBC questioned Defendant FALLS as to whether *Journeyman* were the misappropriated, copied, or otherwise manipulated work of another author.

69. It is well documented in transcript and/or audio interview with Defendant FALLS that Defendants FOX et.al. and/or NBC limited their query to one

(1) novel [The Time Traveler's Wife] and one (1) television show [Quantum Leap] and that Defendant FALLS response was equally limited.

70.   Not withstanding Defendant FALLS denial of the two (2) very specific inquiries re: previously existing works, and his lack of successful experience as "creator" for a television series and no experience writing in the Science Fiction genre, Defendants Fox and/or NBC did not act in a manner consistent with due diligence nor did they follow basic standards of television production procedure by confirming the authentic ownership of the work which Defendant FALLS infringed from an author other than himself into what is, at best, a derivative work of the already copyrighted work *An Ordinary Hero*.

71.   Though Defendants FOX, et.al. and/or NBC may not have known to whom the infringed work belonged, considering Defendant FALLS prior work history and public reviews of his "solo" writing/creator forays, *Journeyman* was clearly not the creative work of Defendant FALLS.

72.   Having so egregiously failed to validate and/or document Defendants FALLS authentic original creation of *Journeyman*, Defendants FOX, et.al. failed to act in a manner consistent with that expected of any normal and average person and may, therefore, cause them to be liable for selling misappropriated Intellectual Property via an act of "willful blindness".

73.   Likewise, Defendants FOX, et.al. and/or NBC's failure to validate the authenticity of the origins of *Journeyman*, therefore, may be liable for purchasing and/or licensing misappropriated Intellectual Property.

74.  Re: Defendant FALLS ability to derive *Journeyman* through "original creation", his "noted" response is well documented in transcripts and/or audio interviews - he proudly states that he had "run out of ideas" until Defendant KORMAN said the two magic words "time travel".

75.  Defendant FALLS, having previously been completely out of ideas and with no prior interest or experience in genre of time-travel, as he "did not understand it", was suddenly and miraculously filled with ideas he had not previously possessed in a genre he did not understand.

76.  Defendant FALLS internet filmography demonstrates that he was underemployed in 2003 (with the end of *The West Wing*) virtually unemployed all of 2004 and 2005 and a portion of 2006.

77.  Defendant KORMAN was in a position to be highly motivated to secure/assure Defendant FALLS had material with which to be gainfully employed. His agent's percentage of Defendant FALLS almost nothing was less than almost nothing. During the alleged copyright infringement, Defendant KORMAN was a partner at Defendant UTA and in a pivotal position. Defendant KORMAN is/can be responsible for finding/acquiring/providing employment vehicles for the talent he represents to assure their employment within the entertainment industry via solicited/unsolicited submissions and his connections to various production companies and networks.

78.  According to reports in industry publications, in or about mid-2006 American Broadcast Corporation ("ABC"), a competing network to Defendant NBC,

announced its intent to air a time-travel series. Were ABC able to find a time-travel treatment to its liking, it was fairly assured the treatment would be purchased, produced and aired. Knowing this, Defendant FALLS approached ABC with *Journeyman*. ABC declined.

79. Defendant FALLS later approached Defendant NBC. It is believed Defendant NBC hoped to garner the mainstream, non-cable, Sci-Fi audience, with a preemptive time-travel series of their own, before any Johnny-come-lately series ABC aired later on. Defendant NBC accepted FALLS' pitch/treatment for *Journeyman*.

80. Post cancellation of *Journeyman*, ABC aired a time-travel series called *Life on Mars*.

81. During August of 2007 promos for *Journeyman,* Defendant FALLS was noted solely as "4-time Emmy winner KEVIN FALLS, of *The West Wing*". In no press interviews, prior to or during the months *Journeyman* aired, were there any references to Defendant FALLS as a writer of any kind ("solo" or otherwise), nor were the creator credits to which he was a party expressed nor could any positive reviews of same be located. Defendant FALLS only reviews as "creator", "writer", "romance story teller" are three (3) negative assessments of his talent (or lack thereof), in the specific areas which encompass the storyline of *Journeyman* en toto.

82. *Journeyman*, the slavish copy of Plaintiff FELDMAN's *Overlap Series - An Ordinary Hero, The Comfort of Strangers, The Red Tattoo, Days of Grace*, and personal letters which reside in her computer and unusual the

$-23-$

facts/details of Plaintiff's personal life; was produced by Defendant FOX et. al., and aired on Defendant NBC's network from Sept. 24, 2007 through to Dec. 19, 2007 in the form of *Journeyman.*

83. Plaintiff FELDMAN became aware of the infringement with the airing of Episode 103 (Oct. 8) and reviewing Episodes 101 and 102 on the NBC website.

84. Plaintiff FELDMAN recognized entire scenes, passages, mode, method, and function of her work (not yet in print or available to the public) which were replicated exactly as they exist within the pages of *An Ordinary Hero, The Comfort of Strangers* and *The Red Tattoo.*

85. *Journeyman* was produced and distributed by the Defendants acting in concert with one another.

86. After *Journeyman* was cancelled, Defendant FALLS described three (3) additional *Journeyman* episodes which were not filmed, but which continue to follow the precise storyline/plotline of *An Ordinary Hero.*

87. Numerous striking similarities between the Defendants' *Journeyman* and Plaintiff's copyrighted work *An Ordinary Hero* include (without limitation) [1] the objective of the series storyline – to fix lives in trouble; [2] the "city" location where the series was filmed and that the city possesses a transit system which runs on rails above ground; [3] the specific names of the characters; [4] the specific lives of the characters; [5] the specific actions of the characters; [6] the specific technology to which the most main character (a tall blue-eyed, blond traveler) has daily access/makes use as part of his

profession; [7] there are five (5) main characters - three (3) are employed in three (3) separate areas of the same profession; one (1) is in law enforcement; one (1) is involved in government; [8] the format, manner, and mode of the time-travel element; [9] the specific tragedy components of the romantic element as it relates to time-travel; [10] the specific "warning signs" of the time-travel element which demand a specifically limited interval preceding travel; [11] the type of person selected to be a time-traveler; [12] the specific real-life events chosen for inclusion in the storylines; [13] the specific non-life events chosen for inclusion in the storyline; [14] the specific evidence that time travel is real and really happening; [15] the resignation of the travelers that time travel is a component of their lives; [16] innumerable other similarities which make *Journeyman* a slavish copy of the Plaintiff's copyrighted material; and [17] those unusual facts of Plaintiff's personal life

88. Numerous striking similarities between the Defendants' *Journeyman* and Plaintiff's copyright applied work *The Comfort of Stranger, The Red Tattoo Days of Grace,* the content of two letters found only in Plaintiff's computer and personal telephone conversations; which include (without limitation) similarities in (1) the objective of the series storyline; (2) the location where the series takes place (that the city possesses an above ground transit system running on rails; (3) the specific names of the characters; (4) the specific lives of the characters; (5) the specific acts/actions of the characters; (6) the format, manner, and mode of the time-travel element; (7) the specific tragic

components of the romantic element;  (8) the existence of "warning signs" which specifically limit the interval preceding travel;  (9) the specific "after-effect" of time-travel (10) the type of person selected to be a time-traveler;  (11) the specific real-life events chosen for inclusion in the storylines;  (12) the specific non-real-life events chosen for inclusion in the storyline;  (13) specific types of outcomes which cannot be altered by the traveler;  (14) the specific evidence that time travel is a fact;  (15) that everything within the series happens for a reason unknown at the time of travel, but whose reason is revealed at the end of each episode/novel and which connects everything in the series to every other thing in the series;  (16) the specific time-travel destination of each traveler;  (17) innumerable other similarities which make *Journeyman* a slavish copy of the Plaintiff's copyright-application material *The Comfort of Strangers, The Red Tattoo, Days of Grace.*  All are the identical points noted by Defendant FALLS in assorted interviews re: the serial time-travel work *Journeyman.*

89. Knowingly trading upon the unauthorized use and exploitation of the creative works embodied in Plaintiff's *Overlap Series* (including but not limited to *An Ordinary Hero*; *The Comfort of Strangers*; *The Red Tattoo, Days of Grace,* as well as personal letters found only in Plaintiff's computer and personal telephone conversations), the Defendants garnered a surprising cult following for *Journeyman*, and earned second (2nd) place in the 2007 "People's Choice Awards" (Best New Drama) and enough commercial success to stir up what came to be called the "Rice-a-Roni Campaign" - the

fact of which garnered much additional internet and other press, and literally tens of thousands of 'blog' and *Journeyman* website entries from as far away as Australia, in an effort to keep the show on the air.

90.    These acts of "rescue by viewers" belie the "alleged" low viewership attributed to *Journeyman*. A show cannot garner the people's vote if the people did not watch. It is believed there is another subversive reason *Journeyman* was aired then cancelled and that its cancellation was actually in spite of its success. It seems that the principals and guest stars involved in *Journeyman* immediately moved on to other vehicles – those intended from the beginning – those other shows whose storylines and characters mirror those within *The Overlap Series*. It is believed that *Journeyman* was aired knowing it would be recognized by its actual author who would spin her wheels trying to acquire legitimate council while at the same time being "blown-off" by not only the network (Defendant NBC) but the production company (Defendant FOX et.al) and Defendant FALLS.

91.   With the cancellation of *Journeyman*, Defendant KEVIN FALLS lost/gave up the designation "KEVIN FALL, 4-time Emmy winner of the *West Wing*" and became "KEVIN FALLS of *Journeyman*" to maintain his connection with any successful show in which he was designated as either "creator" or "solo writer". Previous to *Journeyman*, Defendant FALLS' held no successful "solo" writing nor "creator" positions and his **"success"** in Hollywood was one based on and **limited** to that of a **"one of"** position – "one of" not fewer than ten (10) other co-executive producers.

92. As a result of the success of *Journeyman*, yet its cancellation, Defendant KEVIN FALLS was granted opportunities to pitch other ideas of which he is also *NOT* the "creator" – La Lola, the American version of what can only be the slavish remake of *Goodbye Charlie* without benefit of credit to its actual creator George Axelrod.

93. As a result of the success of *Journeyman*, yet its cancellation, Defendants NBC and FOX, et.al. licensed the sale of *Journeyman* episodes through Defendant Does iTUNES and AMAZON.COM.

94. As a result of the success of *Journeyman*, yet its cancellation, Defendants continue to infringe on Plaintiff's copyright and royalties by licensing numerous Defendant DOES websites the privilege of offering free downloads of *Journeyman* episodes to consumers. These websites, and therefore the Defendants, garner revenues via "charge-for-advertising", to pay for licensing Journeyman episodes in the first place.

95. As a result of the success of *Journeyman,* yet its cancellation and knowingly trading upon the unauthorized use and exploitation of the creative works embodied in Plaintiff's *Overlap Series* (including but not limited to *An Ordinary Hero*; *The Comfort of Strangers*; *The Red Tattoo, Days of Grace,* as well as personal letters found only in Plaintiff's computer and personal telephone conversations), Defendants FALLS and KORMAN garnered recognition and acclaim for themselves Plaintiff FELDMAN's work.

96. Plaintiff FELDMAN notified Defendant KEVIN FALLS, at 4114 Fulton Avenue, Sherman Oaks, California;  Defendant NBC, at 30 Rockerfeller

$-28-$

Plaza, New York, New York 10112; Defendant FOX, at 10201 W. Pico Boulevard, Los Angeles, CA 90064, in writing, via priority mail, on December 6, 2007 of the infringement. Delivery was confirmed by the U.S. Postal Service, on December 10, 2007.

97. December 11, 2007 was the pick-up date for *Journeyman*. Defendant NBC allowed the pick-up date to pass which cancelled the *Journeyman* series and barred any additional episodes or what the television industry refers to as "a back 9", for which lack of viewership is blamed.

98. Defendant FALLS responded via FOX et.al.'s in-house attorney, Susan Seager, who appears to have purposefully made erroneous comparisons of *Journeyman* to *An Ordinary Hero* as well as threats to dissuade Plaintiff FELDMAN from pursuing her rightful and legal claim to her own intellectual property as embodied in *Journeyman*.

99. Defendant FOX et.al. response to Plaintiffs letter advising the potential of a plagiarism lawsuit was to say they were ["not accepting unagented submissions at this time"].

100. Defendant NBC failed to respond to Plaintiff's Cease and Desist letter all together, except that to cancel *Journeyman*.

101. Throughout the course of and subsequent to the Defendants production of *Journeyman*, no Defendant contacted Plaintiff FELDMAN with the purpose of seeking "authorization to license" or for any purpose whatsoever, including the acts described herein.

102. As previously noted (#88) additional TV shows embody whole scenes and

characters from Plaintiff FELDMAN's published and **currently unpublished** (but copyrighted/copyright applied) work and/or her real life. Whole sections of Plaintiff FELDMAN's currently unpublished works and/or her life, including actions and storylines are fully emulated by Defendant SHONDA RHIMES in *Grey's Anatomy* and to a certain extent in *Private Practice*, via characters, their lives, sub-plots, and adjacent storylines.

103. Based on Defendant RHIMES prior work and her 2003 Razzie Awards nomination for **Worse Screenplay** and **Worse Picture** (*Crossroads*), upon information and belief, Defendant RHIMES acted in concert with Defendant GORDON, et.al. to produce a work not of her own "original creation". Defendant RHIMES and Defendant GORDON, et.al.'s product fully emulates the **unpublished** work of Plaintiff FELDMAN whole identical in storyline, action, character development, and narrative/dialog.

104. Defendant RHIMES 2005 nomination for Best Screenplay aside (*Princess Diaries 2*), the ideas and intellectual property behind the screenplay were not that of Defendant RHIMES. She did not "create" the *Princess Diaries* franchise, but is one of its writers. Upon information and belief, Defendant GORDON, et.al. failed to verify the origins of works currently attributable to Defendant RHIMES.

105. Failure to validate and/or document Defendants RHIMES authentic "original creation" claim for *Grey's Anatomy/Private Practice*, Defendant GORDON, et.al. acted in a manner inconsistent with those expected of any normal and

average person and may, therefore, cause him to be liable for producing a product based on misappropriated Intellectual Property via an act of "willful blindness".

106.   Defendant ABC TV's failure to confirm or document the authentic ownership of the plot, characters, and storyline currently attributed to Defendant RHIMES in *Grey's Anatomy/Private Practice*, therefore, may cause them to be liable for purchasing and/or licensing misappropriated Intellectual Property.

107.   Plaintiff FELDMAN never contacted Defendants RHIMES, GORDON, et.al., or ABC TV.

108.   As noted in point 88, additional TV shows embody scenes and characters, storyline, base plotline from Plaintiff FELDMAN's published and **currently unpublished** (but copyrighted/copyright applied) work and/or her real life, specifically, but not limited to **the time-travel episode**. Whole sections of Plaintiff FELDMAN's currently unpublished works and/or her personal family life, including actions, storylines, plotlines and device are fully emulated by Defendants BERLANTI and GUGGENHEIM in the TV show *Eli Stone* via characters, sub-plots, and adjacent storylines.

109.   Agents for Defendants BERLANTI and GUGGENHEIM are in a position to assure/insure that their clients are gainfully employed.   Agents for Defendants BERLANTI and GUGGENHEIM, working at Defendant ENDEAVOR, were in a position to be acquainted with Defendant KORMAN, agent to Defendant FALLS.

110. Upon information and belief, Defendants BERLANTI and GUGGENHEIM acted in concert with Defendant KORMAN to acquire a work not of their "original creation" to pass off as their own. Defendants BERLANTI and GUGGENHEIM's product fully emulates the published and **unpublished** work of Plaintiff FELDMAN, wholly identical in storyline, action, references, character development, and plotline.

111. Upon information and belief, based on Defendants BERLANTI and GUGGENHEIM's overall success in Hollywood Defendant ABC failed to verify the actual origins of the storyline/plotline within the work *Eli Stone* currently attributable to Defendants BERLANTI and GUGGENHEIM.

112. Failure to validate and/or document Defendants BERLANTI and GUGGENHEIM authentic original creation of *Eli Stone*, Defendant ABC acted in a manner inconsistent with those expected of any normal and average person and may, therefore, cause them to be liable for producing a product based on misappropriated Intellectual Property via an act of negligence.

113. Likewise, Defendant ABC TV's failure to confirm or document the authentic ownership of the plot, characters, and storyline currently attributed to Defendants BERLANTI and GUGGENHEIM in *Eli Stone*, therefore, may cause them to be liable for purchasing and/or licensing misappropriated Intellectual Property.

114. Plaintiff FELDMAN never contacted Defendants BERLANTI, GUGGENHEIM or ABC TV.

- 32 -

115. As noted in point 88, additional TV shows embody scenes and characters, storyline, base plotline from Plaintiff FELDMAN's published and **currently unpublished** (but copyrighted/copyright applied) work and/or her real life, portions of BRUNO HELLER's work on *The Mentalist* bears striking resemblances to a jumbled collection of the minute details existing within the *Overlap* series and/or Plaintiff FELDMAN's real life.

116. As previously noted (#88), additional TV shows embody scenes, elements, characters, storyline, base plotline from Plaintiff FELDMAN's published and **unpublished** work (copyrighted/copyright applied) and/or her real life, specifically **the time-travel episode** of the TV drama *Supernatural*.

117. Plaintiff FELDMAN never contacted BRUNO HELLER nor ERIC KRIPKE (*Supernatural*).

118. Upon belief and understanding, it appears that Plaintiff FELDMAN's literary works and life have been disseminated throughout Hollywood as fodder for an assortment of shows and ideas to which she was given no credit or remuneration.

## FIRST CLAIM FOR RELIEF

### (Copyright Infringement 17 U.S.C. § 101, et seq.)

119. Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 118 of this Complaint as if fully set forth herein.

120. *An Ordinary Hero*; *The Passion of Strangers* (1994) /*The Comfort of Strangers* (edited 2008); *The Red Tattoo* and *Days of Grace* are original works, copyrightable under 17 U.S.C. § 102. As lawful owner of the United

−33−

States Copyright Registration Number TXu1-113-763, service request for copyright 1-149428301; and service request for copyright 1-149430471, Plaintiff FELDMAN is entitled to, inter alia, "the exclusive rights to do and to authorize the copyrighted work." 17 U.S.C. § 106.

121.   Without Plaintiff's authorization or consent, the Defendants copied, commercially exploited, and distributed derivative works, through Defendants' production, airing and licensing of *Journeyman*.

122.   The Defendants' unauthorized use, copying and dissemination of the Journeyman television series in interstate commerce constitute actual infringement of the Plaintiff's copyright.

123.   Upon information and belief, the Defendants' infringement is willful in nature.

124.   The Defendants' intention to continue to license episodes of the series Journeyman constitutes a further threatened infringement of the Plaintiff's copyright.

125.   By reason of the foregoing acts of copyright infringement and the likelihood of continued copyright infringement by Defendants, the Plaintiff has sustained and, if not enjoined, will continue to sustain substantial damages.

126.   Further, by reason of the Defendants' infringement and threatened future infringement, the Plaintiff has sustained and, if the Defendants' acts are not enjoined, will continue to sustain irreparable harm for which no adequate remedy at law exists.

### SECOND CLAIM FOR RELIEF

### (Misappropriation)

127. Plaintiff repeats and relleges the allegations of paragraphs 1 through 126 of this Complaint as if fully set forth herein.

128. The Plaintiff's original labor and expense in creating and developing the concept for *An Ordinary Hero* (and the rest of *The Overlap Series*) was misappropriated by the Defendants for their own commercial advantage and in direct competition with the Plaintiff by way of copyright infringement.

129. Further, the Defendants threaten further misappropriation by the continued use of the Plaintiff's intellectual property.

130. The unauthorized use of Plaintiff's intellectual property by the Defendants will allow them to take an unfair competitive advantage and allow Defendants to take for their own benefit the effort expended by the Plaintiff as the developer, owner and creator of the intellectual property and any other attendant commercial rights.

131. By reason of the foregoing acts of misappropriation and threatened misappropriation by the Defendants, the Plaintiff has sustained and, if not enjoined, will continue to sustain substantial damages.

132. Further, by reason of the Defendants' misappropriation and threatened misappropriation, the Plaintiff has sustained and, if the Defendants' acts are not enjoined, will continue to sustain irreparable harm for which no adequate remedy at law exists.

133. If the Defendants are not enjoined from their unlawful activity, the Plaintiff

and other screenwriters will be deterred from developing and creating such
works and, thus, depriving the public the benefit of such works.

## THIRD CLAIM FOR RELIEF

### (Unfair Competition)

134. Plaintiff repeats and realleges the allegations of paragraphs 1 through 133
of this Complaint as if fully set forth herein.

135. The Defendants' acts and their threatened acts, as described above, will
constitute unfair competition in violation of applicable law.

136. Defendants are acting and will continue to act willfully and in bad faith and
to compete unfairly with the Plaintiff.

137. By reason of the Defendants' conduct, the Plaintiff has sustained and, if not
enjoined, will continue to sustain substantial damages.

138. By reason of the Defendants' conduct, the Plaintiff has sustained and, if not
enjoined, will continue to sustain irreparable harm for which no adequate
remedy at law exists.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

139. Plaintiff repeats and realleges the allegations of paragraphs 1 through 138
of this Complaint as if fully set forth herein.

140. Through the commercial exploitation of the Plaintiff's original, copyrighted
works, the Defendants have enjoyed increased revenue, publicity, and
notoriety.

141. Moreover, through the threatened, continued commercial exploitation of the

Plaintiff's original, copyrighted works, the Defendants will likely enjoy further revenue, publicity, and notoriety, if their activities are not enjoined.

142. By reason of the Defendants' conduct, the Plaintiff has sustained and, if not enjoined, will continue to sustain substantial damages.

143. By reason of the Defendants' conduct, the Plaintiff has sustained and, if not enjoined, will continue to sustain irreparable harm for which no adequate remedy at law exists.


**WHEREFORE**, Plaintiff prays:

1.  That Defendants, their officers, agents, servants, employees, and those in active concert or participation with them or any of them, be immediately and permanently enjoined and restrained from any further infringement of the books in *The Overlap Series* – (*An Ordinary Hero; The Comfort of Strangers; The Red Tattoo; Days of Grace*), or any other of Plaintiff's works or derivatives of Plaintiff's works and original and/or personal letters, as infringed in the *Journeyman; Grey's Anatomy; Private Practice; Eli Stone; Supernatural; The Mentalist* series or any other series, in television or any other medium;

2.  That Defendants be immediately and permanently enjoined from creating, issuing, distributing, or otherwise publishing any advertisements for *Journeyman; Grey's Anatomy; Private Practice; Eli Stone; Supernatural; The Mentalist* or any other series, on television or any other medium, which infringes the Plaintiff's copyright;

3.  That Defendants be immediately and permanently enjoined from creating, selling, or otherwise licensing or distributing any merchandise produced in connection with *Journeyman; Grey's Anatomy; Private Practice; Eli Stone; Supernatural; The Mentalist* or any other series, which infringes the Plaintiff's copyright;

4.  That Defendants be required to deliver up to Plaintiff for destruction any and all goods in their possession or under their control, including but not limited to master video tapes, merchandise, clothing, advertisements, and other articles offered for sale and/or distribution that are infringing the Plaintiff's copyright;

5.  That Defendants be directed to pay Plaintiff's damages, including without limitation statutory damages, compensatory damages, and/or punitive damages;

6.  That Defendants be required to account to Plaintiff for any and all profits derived by them through activities which directly or indirectly infringe the Plaintiff's copyright, including but not limited to, all profits derived directly or indirectly from the shows *Journeyman; Grey's Anatomy; Private Practice; Eli Stone; Supernatural; The Mentalist.*

7.  That Defendants reimburse the costs and disbursements of this action;

8.  That Defendants reimburse the costs of reasonable attorney's fees;

9.  That Plaintiffs be awarded both pre-judgment and post-judgment interest on each and every damage award; and

10. Such other and further reliefs the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury upon all issues, to the fullest extent permitted
under applicable law.

Dated: Salem, Massachusetts

March 10, 2009

By: *Debra L. Feldman pro se*

Debra L. Feldman - *Pro se* Litigant

## **VERIFICATION**

I am the named Plaintiff in the above-captioned action. I have read the foregoing

Complaint, and know the contents thereof. The same is true of my personal

knowledge, except for those matters which have been stated herein on

information and belief, and as to those matters, we believe them to be true.

I declare under the penalties of perjury of the United States that the foregoing is

true and correct.

Dated: April 28, 2009

Salem, Massachusetts

*Debra L. Feldman pro se*

Debra Lois Feldman